UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ALAN C. PIPES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 4:08-CV-1195 (CEJ) |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On August 8, 2006, plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., §§ 1381 et seq. (Tr. 85-87). Plaintiff claimed disability due to major depression and motor coordination problems with his hands, with an alleged period of disability from January 1, 2006 to June 2007. (Tr. 20, 107). The applications were initially denied by defendant. (Tr. 55-60). Plaintiff requested a hearing, which was held before an Administrative Law Judge ("ALJ") on February 5, 2008. (Tr. 17). Plaintiff testified at the hearing in response to questions posed by his attorney. (Tr. 17-41).

On February 25, 2008, the ALJ found that plaintiff was not disabled and denied his claims for benefits. (Tr. 9-14). Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied plaintiff's request on June 26, 2008. (Tr. 1-3).

Therefore, the ALJ's determination denying plaintiff benefits stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the time of the hearing, plaintiff was forty-eight years old. (Tr. 20). He was a high school graduate and had enrolled in a community college for approximately two years. (Tr. 21, 176). Plaintiff worked for eleven years as a security guard, primarily making rounds and checking identification cards for employees and visitors. (Tr. 22-23). Plaintiff's employment was terminated in July 2005 for conduct unrelated to his alleged disability. (Tr. 23). Plaintiff testified that he felt that he would be able to work at least on a part-time basis. (Tr. 34). However, plaintiff found it very difficult to find employment and felt that he was being "black listed" from security jobs by his former employer. (Tr. 28). Plaintiff lived alone in an apartment at Father Dempsey's Place, a home for unemployed men who are seeking work. (Tr. 24, 114). Plaintiff never married and has no children. (Tr. 85). His typical day begins with a brisk six to twelve city block walk, followed by shopping around town for food and toiletry items. (Tr. 114). Plaintiff often watched television and socialized with friends. (Tr. 114). Plaintiff regularly visited the library to use the internet and spent his evenings at home watching television. (Tr. 114).

Plaintiff was able to take care of his personal needs in a normal manner, although he often needed assistance remembering scheduled appointments. (Tr. 115-16). He could prepare soups, pasta, and other items using the microwave. (Tr. 116). He reported that he cooked two or three times each week. (Tr. 116). Plaintiff performed his own lawn care work, including mowing, raking, and taking out the trash. (Tr. 116). Plaintiff also did his own laundry and vacuumed his apartment. (Tr. 116). Plaintiff admitted that he has difficulty managing his finances. (Tr. 117).

Plaintiff enjoyed going to sporting events, fishing, going to movies, and eating at restaurants. (Tr. 118). He claimed that his interests had not changed or diminished since his alleged disability began. (Tr. 118). However, he claimed that he had some problems getting along with friends and family, noting that he often has "little disputes" with everyone. (Tr. 119).

Plaintiff claimed that he has problems seeing, concentrating, understanding and using his hands, although he noted that his eyeglasses remedy his sight problems. (Tr. 119). Plaintiff stated that he can follow and understand basic and simple instructions, but he has difficulty following complex instructions. (Tr. 119). He reported difficulty handling stressful situations, claiming that he easily gets frustrated and angry. (Tr. 120).

Plaintiff began seeing a psychiatrist at age eight due to what plaintiff described as a learning disability and an inability to make friends. (Tr. 210). Plaintiff continued to visit a psychiatrist until he reached the age of sixteen. (Tr. 210). In 2007, plaintiff reported that he had been treated primarily with counseling and had not been exposed to psychotropic medication or hospitalized for any psychological condition. (Tr. 190, 210).

### III. Medical Records

On December 20, 2005, plaintiff presented at the Hopewell Center for an initial evaluation. (Tr. 162). Plaintiff stated that he was residing at Father Dempsey's Place and that he needed to come for a psychiatric evaluation in order to continue to stay there. (Tr. 162). Plaintiff reported problems with depression, noting that he gets angry easily. (Tr. 163). He initially complained of occasional insomnia, but he later indicated that he has no problems sleeping. (Tr. 163-64, 166). Plaintiff appeared appropriately groomed with a normal flow of thought. (Tr. 168). Plaintiff described

-3-

his mood as "anxious". (Tr. 170). His affect was noted to be irritable at first, although plaintiff became more cooperative as the session continued. (Tr. 170). Plaintiff was assigned an initial Global Assessment of Functioning ("GAF")[1] score of 50.[2] (Tr. 171).

On March 14, 2006, plaintiff was seen by M. Asif Qaisrani, M.D., at the Hopewell Center. (Tr. 157-161). Plaintiff's chief complaint was that he "needs help". (Tr. 157). Plaintiff indicated that he was taking amitriptyline[3], which had been prescribed for him in 1981, and Prozac[4], which he reported caused severe insomnia. (Tr. 157-158). Plaintiff reported problems with his concentration, energy level and anxiety. (Tr. 158). Plaintiff also indicated that he often felt a sense of hopelessness. (Tr. 158). While his medication helped some, plaintiff did not feel that it helped him with his anger and low frustration tolerance. (Tr. 158). Plaintiff's mood was described as "so-so" and his affect was constricted, anxious to depressed. (Tr. 159). Plaintiff exhibited paranoia, but had no delusions or hallucinations. (Tr. 159). His insight and judgment were fair. (Tr. 159). Dr. Qaisrani diagnosed plaintiff with major depressive disorder[5], recurrent,

---

[1]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[2]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[3]Amitriptyline is an antidepressant agent with mild tranquilizing properties. Although it is usually used as a treatment for depression, it is also used in the treatment of sleep disorders. PDR Medical Dictionary 59 (2d. ed. 2000).

[4]Prozac is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder. See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

[5]Major depression is a mental disorder characterized by sustained depression of mood, sleep and appetite disturbances, and feelings of worthlessness, guilt, and

without psychotic features, and assigned plaintiff a GAF score of 52.[6] (Tr. 160). Dr. Qaisrani recommended that plaintiff be weaned off the amitriptyline and that he take Prozac and Trazodone.[7] (Tr. 160-61).

Plaintiff saw Dr. Qaisrani again on April 11, 2006. (Tr. 150-152). Plaintiff reported that he was still unemployed and living at Father Dempsey's Place. (Tr. 150). Plaintiff stated that, since his last session, he noted improvement in his mood, energy, concentration and social interactions. (Tr. 150). He expressed a positive outlook for the future. (Tr. 150). Plaintiff's thought process was described as goal-directed and logical. (Tr. 150). His affect was broader, stable and appropriate, but slightly anxious. (Tr. 150). Insight and judgment were fair with an understanding of right from wrong. (Tr. 150). Plaintiff indicated that had not started taking the Trazodone, but instead had continued to use Elavil[8] from a previous supply. (Tr. 150). Plaintiff felt that his medicine was helping him sleep and was concerned about switching medications. (Tr. 150). Plaintiff's diagnosis remained Major Depressive Disorder, recurrent without psychotic features. (Tr. 151). Dr. Qaisrani assigned plaintiff a GAF score of 54. (Tr. 151).

---

hopelessness. PDR Medical Dictionary 478 (2d. ed. 2000).

[6] A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[7] Trazodone is a seratonin modulater prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia, anxiety, and alcohol abuse.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html (last visited on September 8, 2009).

[8] Elavil is a brand name for amytriptyline hydrocholride.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html (last visited on September 8, 2009).

On May 9, 2006, plaintiff again presented to Dr. Qaisrani. (Tr. 148-149). Plaintiff reported that his medicine was making him feel better. (Tr. 153). Plaintiff denied having any complaints. (Tr. 148). Since his last appointment, plaintiff stated that his sleep, appetite, interaction, mood, energy, and concentration had all improved and were steady. (Tr. 148). His affect was stable and euthymic. (Tr. 148). Plaintiff's diagnosis remained Major Depressive Disorder and his GAF score was 56. (Tr. 148). Plaintiff was to return to the Hopewell Center in two months for another evaluation. (Tr. 149). Dr. Qaisrani indicated that he would no longer be working at the Hopewell Center and that plaintiff would be seen by Dr. Krojanker in the future. (Tr. 149). The record is void of any treatment notes from any visits plaintiff had with Dr. Krojanker[9], although it was noted that plaintiff missed an appointment scheduled for July 6, 2006 with Dr. "Kro". (Tr. 154). However, on August 18, 2006, plaintiff presented to the Hopewell Center and appeared well-groomed, coherent, and cooperative. (Tr. 147). Plaintiff reported starting a new short term job and was seeking additional employment. (Tr. 147). Plaintiff discussed his anxiety surrounding his job search. (Tr. 147). Although plaintiff was to return for another appointment in three months, (Tr. 147), the record is devoid of any further treatment notes from the Hopewell Center.

On September 20, 2006, plaintiff had a consultative evaluation with Tom Davant Johns, Ph.D., a licensed psychologist. (Tr. 174-179). Plaintiff told Dr. Johns that he was being treated at the Hopewell Center by Dr. Krojanker for depression. (Tr. 174). Dr. Johns believed that plaintiff appeared more anxious than depressed. (Tr. 174).

---

[9]A "Mental Medical Source Statement" in the record bears the name of Rolf Krojanker, M.D., and a signature (Tr. 184). While not entirely legible, the date on the document appears to be February 20, 2007.

–6–

He appeared euthymic with full range of affect. (Tr. 175). Plaintiff reported that his sleep was "very good", and that he has had no problems with his appetite. (Tr. 175). Plaintiff also indicated that his energy level had improved. (Tr. 175). Plaintiff still noted irritability, but acknowledged that had also decreased. (Tr. 175). In addition, plaintiff felt that his sense of hopelessness was decreasing. (Tr. 175). Plaintiff indicated that his anxiety issues stemmed from his lack of social skills. (Tr. 175). He told Dr. Johns that he often felt nervous around new people and new situations. (Tr. 175). Dr. Johns felt that plaintiff suffered from mild to moderate Major Depressive Disorder, single episode, and social anxiety disorder. (Tr. 178). Dr. Johns noted that plaintiff's condition had been improving with his medication. (Tr. 178). Plaintiff's GAF was assessed at 71.[10] (Tr. 178). Plaintiff's prognosis was rated "fair to good". (Tr. 178).

On January 4, 2007, plaintiff was seen by Tony Thrasher, D.O., at the Wohl Clinic at Barnes Jewish Hospital. (Tr. 210). Plaintiff reported to be "doing relatively well", with the exception of his difficulty obtaining employment. (Tr. 212). Plaintiff's mood was good and his affect euthymic. (Tr. 214). Dr. Thrasher noted that plaintiff's depression has been treated "quite well" with medication. (Tr. 214). Plaintiff's diagnosis was mild Major Depressive Disorder, recurrent and nonpsychotic, with a GAF of 80. (Tr. 210). Plaintiff presented to Dr. Thrasher again on February 1, 2007, indicating that he was "a little worn out". (Tr. 204). His affect was euthymic. (Tr. 204).

---

[10]A GAF of 71-80 corresponds with "transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

-7-

Dr. Krojanker completed a Mental Medical Source Statement on February 20, 2007. (Tr. 181-184). Dr. Krojanker opined that plaintiff had marked[11] limitations in his ability to: cope with normal work stress, function independently, behave in an emotionally stable manner, maintain reliability, relate in social situations, interact with general public, accept instructions and respond to criticism, and maintain socially acceptable behavior. (Tr. 182). Additionally, Dr. Krojanker felt that plaintiff also had marked limitations in his ability to: understand and remember simple instructions, make simple work-related decisions, maintain regular attendance and be punctual, complete a normal workday without interruptions, maintain attention, perform at a consistent pace, sustain an ordinary routine, respond to changes in work settings, or work in coordination with others. (Tr. 183). In fact, Dr. Krojanker felt that plaintiff had a marked limitation for every type of ability listed on the questionnaire. (Tr. 182-83). Dr. Krojanker indicated that plaintiff suffered from Major Depressive Disorder and indicated that plaintiff's most recent GAF score was 45, which was assessed in November 2006. (Tr. 184). Dr. Krojanker noted that plaintiff's highest GAF score within the previous year had been 50. (Tr. 184).

Plaintiff was again seen by Dr. Thrasher on March 16, 2007. (Tr. 200-01). Plaintiff's diagnosis remained mild Major Depressive Disorder. (Tr. 201). His GAF was assessed at 80. (Tr. 201). Plaintiff's mood was "real good" and his affect euthymic. (Tr. 200). Three months later, plaintiff presented to Dr. Thrasher again on June 1, 2007. (Tr. 196-97). Plaintiff stated that he felt "concerned", although Dr. Thrasher

---

[11]On the form completed by Dr. Krojanker, a "marked" limitation is defined as being "more than moderate, but less than extreme". (Tr. 181). It is a limitation which "seriously interferes with the ability to function independently, appropriately, and effectively." (Tr. 181).

-8-

described his affect as euthymic. (Tr. 196). His diagnosis and GAF score of 80 remained unchanged. (Tr. 197).

Plaintiff was seen by Elizabeth Woods, M.D., at the Wohl Clinic, on July 11, 2007. (Tr. 190-93). Plaintiff told Dr. Woods that he had been under the care of Dr. Krojanker at the Hopewell Center through January 2007. (Tr. 190). Plaintiff reported having chronic problems with interpersonal relationships. (Tr. 190-91). Plaintiff's mood was stable and his affect was stable and appropriate. (Tr.192). Dr. Woods diagnosed plaintiff with mild depression, but felt that it was currently in remission. (Tr. 192). Plaintiff's GAF was assessed at 70.[12]

Treatment notes indicate that plaintiff presented to Dr. Woods again on August 15, 2007. (Tr. 187-88). Plaintiff's mood "continued to be good". (Tr. 187). Plaintiff reported normal sleep, appetite, energy and concentration. (Tr. 187). Plaintiff was engaged in social and recreational activities. (Tr. 187). Plaintiff described his mood as "pretty good". (Tr. 187). His affect was euthymic. (Tr. 187). His diagnosis remained mild depression, currently in remission. (Tr. 188). Plaintiff's GAF was 65. (Tr. 188).

## IV. The ALJ's Decision

The ALJ made the following findings:

1. The claimant met the special earnings requirement of the Act as of January 1, 2006, the alleged onset of disability, and continues to meet them through the date of this decision.

2. The claimant probably has not engaged in substantial gainful activity since January 1, 2006, although he had nearly $1000 in

---

[12]A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 34 (4th ed. 2000).

-9-

earnings from two different jobs that year, and possibly also some earnings in 2007.

3. The claimant has the following impairments: single episode major depressive disorder, possible social anxiety disorder, possible avoidant personality disorder, and possible hypertension, hyperlipidemia and iron defiency anemia, all mild in severity and controlled by medication.

4. The claimant's allegation of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of all sustained work activity for any continuous period of twelve months or longer is not credible, for the reasons set out in the body of this decision.

5. The claimant has only slight abnormalities that do not significantly affect the performance of any basic work-related activities. Therefore, he does not have a "severe" impairment as defined in 20 CFR 404.1521.

6. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(c)).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv., 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform hid past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A. Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. the ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

B. **Plaintiff's Allegations of Error**

Plaintiff asserts that the ALJ failed to apply the correct legal standard in assessing the severity of plaintiff's impairments at step two of the sequential process. Plaintiff contends that the ALJ's finding that plaintiff's impairments were not severe is not supported by substantial evidence.

Plaintiff also argues that the ALJ failed to give proper weight to the opinions of Dr. Krojanker, one of plaintiff's treating physicians. Plaintiff claims that the ALJ discounted Dr. Krojanker's opinion for improper reasons and contends that the ALJ had

a duty to re-contact Dr. Krojanker for more information prior to discounting his opinions.

### 1. The Severity of Plaintiff's Impairments

Plaintiff claims that the ALJ erred in finding that plaintiff's impairments were not severe at step two of the sequential process. Plaintiff insists that the ALJ used the incorrect legal standard in evaluating the severity of plaintiff's impairments.

"[T]he sequential evaluation process may only be terminated at step two when an impairment or combination of impairments would have no more than a minimal effect on the claimant's ability to work." Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996). The ALJ found that plaintiff "has only slight abnormalities not significantly limiting the performance of any basic work activities." (Tr. 12, 14). Thus, the ALJ improperly applied the "no significant limitation" standard instead of the "no more than a minimal effect" standard. See Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Such an error is harmless when "the ALJ would have reached the same decision denying benefits even if the error had not occurred." Waters v. Astrue, 2008 WL 4280037 at *13 (E.D. Mo. 2008). The Eighth Circuit has found that the erroneous use of the "no significant limitation" standard is harmless where the district court applies the correct standard and still finds that substantial evidence supports the ALJ's decision. Johnston v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000). However, the district court must also evaluate whether the ALJ could have, using the proper legal standard, validly found that plaintiff's impairments had more than a minimal effect on his ability to work. See Caviness, 250 F.3d at 605. If both decisions would be supported by substantial evidence, then the case must be remanded to allow the ALJ to make that determination. Id.

Upon review of the record, the Court cannot say that the ALJ's failure to use the proper legal standard at step two of the sequential process was harmless. When viewing the record as a whole, and applying the proper legal standard, the Court finds that substantial evidence would not only support a decision that plaintiff's impairments are not severe, but would also support a decision to the contrary. Plaintiff claims that he was disabled from January 2006 through June 2007. While plaintiff was assigned GAF scores of 71 (Tr. 178) and 80 (Tr. 197, 201, 205, 210) during that time frame, which would indicate only transient difficulties, plaintiff was also given scores of 45 (Tr. 184), 50 (Tr. 171), 52 (Tr. 160), 54 (Tr. 151), and 56 (Tr. 148). These latter scores correspond with moderate symptoms or difficulty in social or occupational functioning. See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th Ed. 2000). Treatment notes offer some support for such scores, as plaintiff was often described as anxious, irritable, with constricted affect - especially early in the relevant time frame. Plaintiff also frequently complained of having difficulties in social settings and had been receiving counseling on and off since early childhood. Based in part on these lower GAF scores, and their corresponding treatment notes, the Court believes that substantial evidence could support a finding by the ALJ that plaintiff's impairments have "more than a minimal effect" on his ability to work.[13]

---

[13]To be clear, the Court is not making any finding as to whether or not plaintiff's impairments are severe under step two of the sequential process. Instead, the Court's ruling is simply that, when viewing plaintiff's impairments under the proper legal standard, this case is close enough that remand is necessary in order to allow the ALJ the opportunity to make the step two determination. See Caviness, 250 F.3d at 605 (holding that, unless the issue is clear beyond any substantial doubt, the Court should remand the case to allow the ALJ to make the severity determination in the first instance, rather than the Court making the determination itself).

Thus, the Court cannot say that "the evidence [is] so clearly against [plaintiff] that this error of law was harmless." Caviness, 250 F.3d at 605. Because substantial evidence could potentially support either result when using the proper legal standard, the Court must remand this case in order to allow the ALJ to make the severity determination based on the "no more than minimal effect" standard. See Id.

### 2. Weight Given to the Treating Physician's Opinion

Because the Court has determined that this matter must be remanded for an evaluation of the severity of plaintiff's impairments, the Court need not discuss in great length plaintiff's final claim that the ALJ failed to properly weigh the opinion of Dr. Krojanker, one of plaintiff's treating physicians. Dr. Krojanker completed a Medical Source Statement that indicated that plaintiff suffered from marked limitations for nearly every facet of mental functioning. The ALJ discredited Dr. Krojanker's opinions, noting that there were no treatment records from Dr. Krojanker anywhere within the record. Upon remand, the Court believes that it would be proper to contact Dr. Krojanker in order to obtain treatment records that could be used to either support, or detract from, the opinions found on Dr. Krojanker's Medical Source Statement.

### VI. Conclusion

For the reasons discussed above, this matter is reversed and remanded in accordance with sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should re-evaluate the severity of plaintiff's impairments, while clearly and explicitly applying the proper legal standard.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this case is **remanded** for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT COURT

Dated this 8th day of September, 2009.